**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47922**

|  |  |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: November 12, 2021** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| DAVID L. HARDY, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the First Judicial District, State of Idaho, Shoshone County. Hon. Scott L. Wayman, District Judge.

Judgment of conviction for felony injury to a child, affirmed.

Eric D. Fredericksen, State Appellate Public Defender; Ben P. McGreevy, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jennifer M. Jensen, Deputy Attorney General, Boise, for respondent.

_____

BRAILSFORD, Judge

A jury convicted David L. Hardy of felony injury to a child, Idaho Code § 18-1501(1). Hardy moved for a judgment of acquittal under Idaho Criminal Rule 29, and the district court denied the motion. On appeal, Hardy challenges the sufficiency of the evidence to support the conviction. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

The State charged Hardy with two counts of felony injury to a child. At trial, the State presented evidence that Hardy met the mother of a young boy, R.B., in mid-summer 2018. On September 8, Hardy met R.B. for the first time at a party for R.B.'s first birthday. That night, Hardy stayed the night for the first time at the mother's residence, and R.B. was present. On

1

September 11, R.B. had a twelve-month examination by his pediatrician, Dr. Craddock. At that appointment, R.B. did not present with any health concerns.

During the remainder of September, Hardy spent several nights at the mother's residence while R.B. was present. According to the mother's testimony, Hardy was at her residence on September 22 through the morning of September 24. On September 22, the mother and Hardy took R.B. to the emergency room because he had swollen lips, causing the mother to worry about a possible allergic reaction. Then, on September 24, the mother took R.B. for a follow-up appointment with Dr. Craddock. At that time, R.B. had both open wounds and scabbed-over wounds around his mouth that were infected with staphylococcus (staph).

On that same day, September 24, R.B. spent part of the evening at his father's residence and, after dinner, returned to the mother's residence around 7:30 p.m. According to the mother's testimony, R.B. "was playful" after returning from his father's care but fell later that night[1] and did not want to use his left arm, although he continued "running around playing." By the next morning, R.B.'s left arm was swollen and his wrist was bruised so the mother took him to see Dr. Craddock again. X-rays taken during the September 25 appointment revealed two fractures of R.B.'s left forearm. The following morning, the mother and the father took R.B. to the hospital to have his arm cast. At that time, R.B. was admitted to the hospital, and Dr. Sokoloff attended to him.

Among other things, Dr. Solokoff testified about an unexplained bruise on R.B.'s back when he was admitted to the hospital and about a skeletal survey--"a standardized series of x-rays . . . looking at every bone in the body"--which was taken of R.B. on September 25. According to Dr. Solokoff, these x-rays showed fractures of both R.B.'s left and right arms that were no more than a week old as of September 25. Dr. Solokoff further testified R.B.'s injuries were "highly suspicious" of abusive trauma rather than accidental trauma.

On September 27, R.B. was released from the hospital. On that day, a child welfare supervisor from Child Protective Services (CPS) met with the mother and the father. She requested the parents engage in a voluntary safety plan requiring the mother to be with R.B. at all times, keeping him in her line of sight, and not allowing R.B.'s father to be alone with R.B. The next

---

[1]     Initially, R.B.'s mother testified R.B. fell when playing with balloons but later she testified R.B. fell because he tripped over some small dogs.

day on September 28, Hardy again visited the mother's residence and stayed overnight. Although he left the next morning, he later joined the mother and R.B. at the father's residence for a barbeque on the evening of September 29. Hardy, the mother, and R.B. then returned to the mother's residence that night around 9 p.m.

The mother testified that, when they arrived at her residence, she was carrying various items, and Hardy carried R.B. from the car. When Hardy reached the residence's doorway, however, he claimed to have left something in the car and returned to the car with R.B. After Hardy and R.B. failed to return to the residence, the mother went to investigate and saw R.B. laying in the backseat of the car. Hardy was leaning over him, "was scrambling," "pulled . . . something out of a bag," and then "scooped [R.B.] up" quickly. R.B. was crying and Hardy was "guarding him from" the mother and would not allow her to hold him. Eventually, the mother got R.B. from Hardy. That night Hardy stayed at the mother's residence again.

The mother gave differing testimony about what occurred between Hardy and R.B. on the evening of September 29. The mother initially testified that, when Hardy returned to the car with R.B., he was alone with R.B. for about ten minutes. She also testified, however, about a petition for a civil protection order she signed on October 2. In that petition, the mother stated that Hardy was alone with R.B. for about fifteen minutes and that when she "finally got [R.B.] away his face was banged up and he was screaming." Then, she testified about an interview with Detective Lee, during which the mother told Detective Lee that Hardy wanted to help put R.B. to sleep; walked up and down the hallway in the mother's residence holding R.B.; and would not give R.B., who was "fussy" and "grouchy," back to her when she asked.

The next morning on September 30, R.B. was lethargic and acting abnormally. The mother called R.B.'s father using FaceTime, a phone application that makes video calls and that allowed R.B.'s father to see how R.B. looked. The father testified that he immediately went to the mother's residence; R.B. "looked like he just saw a ghost"; and he was largely unresponsive. Both parents took R.B. to the hospital, but before leaving for the hospital, the mother ended her relationship with Hardy.

At the hospital, R.B. presented with bruising on his face and abdomen and an injury to his mouth including a torn frenulum, which according to Dr. Sokoloff's testimony, indicated a significant blunt force trauma. Both of R.B.'s parents testified they learned that R.B.'s right arm was fractured at this September 30 hospital visit, despite Dr. Sokoloff's testimony that this injury

was evident in the September 25 x-rays. After this hospital visit, CPS placed R.B. in foster care. The following week, R.B. had several follow-up medical examinations, and an x-ray taken on October 3 revealed that R.B.'s left leg was fractured sometime after September 25.

Based on these events, the State charged Hardy with two counts of felony injury to a child, I.C. § 18-1501(1).[2] Count I related to the events surrounding R.B's injuries on or about September 24, and Count II related to the events surrounding R.B.'s injuries on or about September 29. Both of these counts alleged either that Hardy "willfully cause[d] or permit[ted] R.B. . . . to suffer, or did inflict upon him unjustifiable physical pain or mental suffering" or alternatively, that Hardy "while having custody of R.B., did permit him to be injured."

The case proceeded to a jury trial and, at the close of the State's evidence, Hardy moved for a judgment of acquittal under I.C.R. 29. In support, Hardy argued the State failed to present sufficient evidence to prove both that he acted willfully and that he had care or custody of R.B. The district court denied Hardy's motion, determining sufficient evidence existed for the jury to find Hardy guilty. The court instructed the jury on both alleged theories that either (1) Hardy willfully caused or permitted R.B. to suffer or willfully inflicted upon R.B. unjustifiable physical pain or mental suffering; or alternatively (2) Hardy had care or custody of R.B. and willfully caused or permitted R.B. to be injured. In a general verdict, the jury acquitted Hardy on Count I regarding the events surrounding September 24 but found Hardy guilty on Count II regarding the events surrounding September 29. Hardy again moved for a judgment of acquittal, arguing insufficient evidence, and the court again denied the motion.

Hardy timely appeals.

## II.

## STANDARD OF REVIEW

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991).

---

[2] During Hardy's trial, the mother testified that the State charged her with a felony; she pled guilty to providing false information; and she had an immunity agreement that the State would not use her testimony at Hardy's trial against her.

4

We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

Similarly, when reviewing the denial of a motion for judgment of acquittal under I.C.R. 29, the appellate court must independently consider the evidence in the record and determine whether a reasonable mind could conclude that the defendant's guilt was proven beyond a reasonable doubt. *State v. Clark*, 161 Idaho 372, 374, 386 P.3d 895, 897 (2016). The relevant inquiry is not whether the appellate court would find the defendant to be guilty beyond a reasonable doubt, but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *see also State v. Willard*, 129 Idaho 827, 828, 933 P.2d 116, 117 (Ct. App. 1997) (ruling same standard applies to review of denial of I.C.R. 29 motion as review of substantial evidence to support verdict).

## III.

## ANALYSIS

Hardy challenges the sufficiency of the evidence to support the jury's finding of guilt. Specifically, Hardy argues the jury could not have properly found either that he "had care or custody of R.B." or alternatively that he "willfully caused R.B. unjustifiable physical pain or mental suffering." When a jury renders a general verdict--as in this case--"the inquiry on appeal becomes whether there was sufficient evidence to uphold any one of the bases of conviction." *State v. Cortez*, 135 Idaho 561, 564, 21 P.3d 498, 501 (Ct. App. 2001). We hold the State presented substantial evidence upon which a reasonable trier of fact could have found beyond a reasonable doubt that Hardy willfully caused R.B. unjustifiable physical pain or mental suffering. As a result, we do not address Hardy's argument that he did not have care or custody of R.B.

In the context of I.C. 18-1501(1), "'willfully' means acting or failing to act where a reasonable person would know the act or failure to act is likely to result in injury or harm or is likely to endanger the person, health, safety or well-being of the child." I.C. § 18-1501(5). This definition requires "from the standpoint of a reasonable person, knowledge of circumstances *likely* to result in injury or endangerment of a child before criminal culpability attaches." *State v.*

5

*Gonzales*, 158 Idaho 112, 118, 343 P.3d 1119, 1125 (Ct. App. 2015). "It does not include the mere failure to notice danger, and the fact that a child is ultimately injured or endangered is, by itself, insufficient to convict." *Id.*

On appeal, Hardy asserts the State failed to prove his conduct on or about September 29 was "willful." In support of this assertion, Hardy argues that the mother "did not notice that R.B. was lethargic until the morning [of] September 30; the injuries to R.B.'s mouth were "related to the staph infection [R.B.] already had"; and the doctors "did not discover R.B.'s broken leg until October 3." Hardy's argument ignores substantial evidence of Hardy's access to R.B., including on September 29; the nature of R.B.'s injuries, which indicate a willful infliction of harm; and the timing of those injuries.

For example, the mother testified that on September 29, Hardy was alone with R.B. for about ten to fifteen minutes. After Hardy had been alone with R.B., the mother saw Hardy leaning over R.B., who was "crying" and "screaming" and his face was "banged up." Hardy was "guarding" R.B. from the mother and refusing to allow her to hold R.B. When he did return R.B. to the mother, Hardy "wouldn't back off" and stated, "I didn't mean to overstep." The next morning, R.B. was lethargic, acting abnormally, unresponsive, and "looked like he had seen a ghost."

According to medical testimony, R.B. presented at the hospital that next morning with bruising, including a "pattern bruise" of a "very classic slap mark" on his face "indicative of an open-handed strike with significant force" and a bruise on the abdomen, which appeared to be nonaccidental. R.B. also had a torn frenulum indicative "of significant blunt force trauma to the mouth" and the type of injury caused by "somebody hitting a child in the mouth, punching, kicking." Additionally, R.B. had fractures, including "buckle fractures," about which Dr. Sokoloff testified in his "strong opinion" were the result of "abusive trauma." Dr. Sokoloff defined "abusive trauma" as "willful harm inflicted on a child."

R.B. sustained these and numerous other injuries by September 30, after his twelve-month wellness examination at which he had no health concerns. As Detective Lee testified, based on his investigation "the only thing different" about R.B.'s life in September 2018 when the injuries started happening was Hardy's presence in R.B.'s life. Based on the evidence of Hardy's opportunity to injure R.B. and of the timing and the nature of R.B's. injuries, we conclude any

6

rational trier of fact could have found Hardy willfully caused R.B. unjustifiable physical pain or mental suffering.

## IV.
## CONCLUSION

Substantial and competent evidence supports the jury's verdict that Hardy willfully caused R.B. unjustifiable physical pain or mental suffering. Accordingly, the district court did not err in denying Hardy's I.C.R. 29 motion for judgment of acquittal, and we affirm the court's judgment of conviction.

Chief Judge HUSKEY and Judge GRATTON **CONCUR**.